**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **ANGELA JEST,**<br><br>      Plaintiff,<br><br>      v.<br><br>**ARCHBOLD MEDICAL CENTER, INC.,**<br><br>      Defendant. | Civil Action No. 7:11-cv-161 (HL) |

**ORDER**

Before the Court is Defendant Archbold Medical Center, Inc.'s ("Defendant") Motion for Summary Judgment (Doc. 19). For the reasons stated below, the Motion is granted.

I.   **FACTUAL BACKGROUND**

Plaintiff Angela Jest is an African-American female who was diagnosed with neuropathy in August 2004. (Defendant's Statement of Material Facts ("DSMF")[1] ¶¶ 1, 2, 48.) Defendant Archbold is a corporation that operates hospitals in various locations in south Georgia, including Thomasville (John D. Archbold Memorial Hospital) and Cairo (Grady General Hospital). (DSMF ¶ 3.)

Plaintiff was employed by Defendant for a period of approximately seventeen years, spanning from December 1993 until March 2010. (DSMF ¶ 4.)

---

[1] All citations to the Defendant's Statement of Material Facts refer to facts which have been admitted by Plaintiff unless otherwise explicitly stated.

Plaintiff started her work with Defendant in 1993 as a Licensed Practical Nurse (L.P.N.) at Grady General Hospital in Cairo, where she worked in labor and delivery and took care of patients, provided nursing care, and worked as an L.P.N. charge nurse. (DSMF ¶ 10, 11.) In 1996, she became a Registered Nurse (R.N.) and worked in the medical-surgery unit at Grady General. (DSMF ¶ 13.) In August 1999, Plaintiff requested work at Archbold Memorial Hospital in Thomasville, Georgia as a "float R.N." (DSMF ¶ 14.) Plaintiff's request was granted. In October 2000, Plaintiff made another transfer request for a part-time position in IV therapy at Archbold Hospital. (DSMF ¶ 15.) This request was granted. In 2001, Plaintiff began work as a medical-surgical "float R.N." at Archbold Hospital. (DSMF ¶ 16.) She was transferred to the Mother/Baby ("MOBA") unit at the same hospital in March 2004 (DSMF ¶ 18) where she worked until her termination in 2010 (DSMF ¶ 4).

In August 2004, Plaintiff was diagnosed by Dr. Edmond Molis with "sensory and autonomic neuropathy which could be related to amyloidosis or primary autonomic neuropathy." (DSMF ¶ 48.) In September 2004, Dr. Molis wrote a note that Plaintiff "should not work more than [three] days in a row, followed by a [three] day rest period before her next shift." (DSMF ¶ 51.) Plaintiff's work schedule was consistent with Dr. Molis's recommendation, so Plaintiff did not have to change her hours to accommodate his instructions. (DSMF ¶¶ 52, 53.) In April 2005, Plaintiff was diagnosed with bilateral tarsal tunnel syndrome by Dr. Nicodemo Macri. (DSMF ¶ 64.) Dr. Macri recommended

that Plaintiff work only eight hours a day and no more than two consecutive days. (DSMF ¶ 66.) Dr. Macri also recommended that Plaintiff be allowed to do exercise with a ball once a day for three to four minutes and that Plaintiff should have frequent rest breaks. (DSMF ¶¶ 67, 68.) Plaintiff made her supervisors aware of Dr. Macri's instructions, and Defendant complied with the instructions regarding Plaintiff's work schedule, her physical therapy, and her rest breaks. (DSMF ¶¶ 69, 70, 71, 72.)

During the time that Plaintiff worked for Defendant, she was subject to a number of disciplinary proceedings. She was the subject of six tardiness disciplinary actions. For each disciplinary action, she was placed on a ninety-day probationary period. These actions occurred on August 3, 1994 (DSMF ¶ 24); December 24, 1996 (DSMF ¶ 32); December 16, 1997 (DSMF ¶ 33); September 11, 1998 (DSMF ¶ 34); April 13, 1999 (DSMF ¶ 35); and September 26, 2000 (DSMF ¶ 38). She was also the subject of two disciplinary actions for failure to clock in and out. These occurred on September 4, 2009 (DSMF ¶ 93) and March 22, 2010 (DSMF ¶ 108). Plaintiff was the subject of five absenteeism disciplinary actions; she was placed on a ninety-day probationary period for each action. These actions took place on November 16, 1999 (DSMF ¶ 36); February 16, 2000 (DSMF ¶ 37); March 19, 2001 (DSMF ¶ 39); April 10, 2001 (DSMF ¶ 43); and January 16, 2009 (DSMF ¶ 88).

In addition to the above-mentioned infractions, Plaintiff's personnel file is fraught with various corrective interviews. The following timeline summarizes these interviews:

- June 13, 1994: Corrective Interview for failure to check in with her unit and being late. (DSMF ¶ 20.) Plaintiff disputes the validity of this disciplinary action (Plaintiff's Statement of Material Facts ("PSMF") ¶ 20), and claims that she did not fail to check in and she was not as late as Defendant claims.

- July 29, 1994: Corrective Interview for failure to attend mandatory classes on electronic fetal monitoring. (DSMF ¶ 22.)

- March 27, 1995: Corrective Interview for failure to clock out properly. (DSMF ¶ 25.)

- September 15, 1995: Final Corrective Interview for leaving the premises without permission. (DSMF ¶ 26.) Plaintiff disputes the validity of this disciplinary action. (PSMF ¶ 26.) Plaintiff claims that she did not have a patient at the time, and therefore, she believed she was authorized to the leave the premises.

- May 17, 1996: Final Corrective Interview transferring Plaintiff from obstetrics to the medical-surgery unit at Grady General. (DSMF ¶ 28.) This Interview was based on several incidents: (1) Plaintiff allegedly delayed sending three urine specimens to the lab; (2) Plaintiff took the only newborn infant from the mother's room and then from the nursery and sat in one of the birthing rooms with the infant and watched television; (3) Plaintiff did not give her complete report when she came to work; (4) Plaintiff allegedly acted in an unprofessional manner towards another nurse; and (5) two physicians complained about Plaintiff and expressed concerns about her work performance. Plaintiff disputes the validity of the disciplinary action. (PSMF ¶ 29; *see also* Doc. 26-4, p. 45.)

- March 28, 2001: Corrective Interview for unprofessional behavior and neglecting duties. (DSMF ¶ 40.) Plaintiff disputes the validity of this action. (PSMF ¶ 40; *see also* Doc. 26-4, p. 57-58.) Plaintiff states that she "hopes as much interest was taken in Lori Kola-Roser [sic] calling me a bitch in front of the nursing staff. Most of this Interview is incorrect.

4

I am professional and keeps the [patient's] interest in mind at all times." (Doc. 26-4, p. 57-58.)

- November 18, 2003: Written warning based on concerns about Plaintiff's performance issues with patient care. (DSMF ¶ 44.)

- February 21, 2005: Plaintiff failed to give pain medication to a patient, though the patient's chart reflected that she had administered the medication. (DSMF ¶ 55.)

- February 22, 2005: Plaintiff changed the schedule for administering medication to a patient without notifying the pharmacy. (DSMF ¶ 56.)

- April 15, 2005: Corrective Interview regarding professionalism. This interview was based on several incidents: (1) physicians and midwives voiced concerns about calls they received from Plaintiff with questions about patient care, raising concerns about Plaintiff's assessment skills; (2) Plaintiff needed to review charts more carefully before calling physicians; and (3) Plaintiff walked around the hospital with her shoes off because "she had bad feet" and she sometimes soaked her feet at night. (DSMF ¶ 57.) Plaintiff disputes the validity of this disciplinary action. (PSMF ¶ 57; see also Doc. 26-5, p. 6-7.) Plaintiff claims that she was not made aware of any complaints and that she had no indication from her patients that they were displeased with her job performance. (Doc. 26-5, p. 7.) Plaintiff agreed to keep her shoes on while at work. Id.

- April 15, 2005: Final Corrective Interview regarding unacceptable work behavior including: (1) lack of proper patient care; (2) interrupting a nurse who was assisting a patient by asking her to bring Plaintiff some sugar from the kitchen; (3) leaving the unit for a break at an inappropriate time; (4) failure to properly answer call lights; (5) lack of organizational skills; and (6) failure to properly prioritize. (DSMF ¶ 61.) Plaintiff disputes the validity of this disciplinary action. (PSMF ¶ 61; see also Doc. 26-5, p. 9.) Plaintiff denies any knowledge of the sugar incident. Plaintiff also denies leaving her work area for long periods of time without asking fellow nurses to cover her patients. She contends that if she is in the bathroom when a call light goes off "she can't be in [two] places at one time." (Doc. 26-5, p. 9.) She stated that she would "do [her] best to improve the areas [she] can." Id.

- September 27, 2007: Notice of Termination based on an incident when Plaintiff left work to take care of her daughter without notifying her

supervisor that she was leaving. (DSMF ¶ 73.) Plaintiff acknowledges that she left the building, but she alleges that she asked another nurse to cover her patients while she was gone. (PSMF ¶¶ 73, 74.) Plaintiff appealed the Notice of Termination and was reinstated. Her termination was reduced to a Final Corrective Interview. (DSMF ¶ 77.) Plaintiff later accepted responsibility for her actions in a letter dated October 19, 2007, in which she stated that "I have accepted that my conduct was unacceptable and will not do it again." (Doc. 26-5, p. 12.)

- August 2008: Plaintiff's co-workers and a physician complained about Plaintiff's unprofessional behavior. (DSMF ¶ 85.)

- December 15, 2008: Corrective Interview based on Plaintiff's removal of a catheter from a patient even though the urine was tinged with blood. Plaintiff failed to report this finding to the physician. (DSMF ¶ 86.)

- August 4, 2009: Verbal Corrective Interview based on Plaintiff's failure to follow up on medication. (DSMF ¶ 91.)

- October 27, 2009: Verbal Corrective Interview based on a number of incidents including: (1) patient complaints about Plaintiff being inattentive and offensive; (2) a patient's IV tubing came out and instead of replacing the tubing, Plaintiff simply reinserted the old tubing, in violation of hospital policies; (3) failure to properly document urinary output; (4) patient complaints about Plaintiff's failure to properly respond to calls; (5) physician complaints about Plaintiff's competency; and (6) Plaintiff was found asleep during working hours. (DSMF ¶ 94.)

- January 5, 2010: Plaintiff was warned that if the behavior for which she was disciplined in October 2009 continued, she would be subject to additional disciplinary measures, including possible termination. (DSMF ¶ 99.)

- January 20, 2010: Customer Service Probationary Period Evaluation indicated that Plaintiff was not meeting service excellence standards of performance. (DSMF ¶ 101.)

- January 26, 2010: Written Corrective Interview for Plaintiff's failure to properly follow up on medication. (DSMF ¶ 106.)

- March 22, 2010: Final Corrective Interview and Notice of Suspension given to Plaintiff. (DSMF ¶ 109.) The suspension was based on

6

"unacceptable behavior" including: (1) leaving work without permission; (2) performing a bladder scan on a patient without a physician's order; (3) not improving time management and organizational skills; and (4) continued failure to follow up on medications. (DSMF ¶ 110.) Plaintiff disputes the validity of this disciplinary action. (PSMF ¶¶ 109, 110; *see also* Doc. 26-5, pp. 28-29.) Plaintiff claims that taking the bladder scan was a "nursing judgment." About leaving work, Plaintiff contends that she forgot her lunch and her daughter brought it to her and she left her desk for that reason. Id.

- March 23, 2010: An altercation between Plaintiff and Ms. Martha Clyatt, Plaintiff's supervisor, occurred. The altercation was witnesses by Athalena Benton, Shakerra Ivey, and Takeysha Wyche. (DSMF ¶ 112.) Plaintiff claims that there was not an altercation but that there was a "discussion." (PSMF ¶ 112.) Plaintiff also claims that Ms. Clyatt raised her voice at Plaintiff. Id.

- March 31, 2010: Final Notice of Termination. (DSMF ¶ 113.) The Notice mentioned several reasons that prompted the decision to terminate Plaintiff including: (1) customer service issues; (2) failure to follow up on medications; (3) time management issues; and (4) job performance issues. (Doc. 26-5, p. 48.) The Notice stated that "[d]ue to the unprofessional, rude and disrespectful behavior exhibited on March 23, 2010 and ongoing patient safety concerns, you are being terminated effective immediately." Id.

Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") and filed an Intake Questionnaire on July 5, 2010, alleging race and disability discrimination by Defendant. This suit arises out those allegations.

II.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). A genuine issue of material fact arises only when

7

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 354-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this framework, summary judgment

must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III. **ANALYSIS**

A. **Race Discrimination Claim**

Title VII provides that an employer may not "discharge any individual … with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, [or] sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case for discrimination under Title VII in one of two ways. First, he may present evidence of discrimination through direct evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004). A claim based on direct evidence requires "the most blatant remarks, whose intent could mean nothing other than to discriminate." Id. (citing Rojas v. Florida, 28 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). The Court must address whether a plaintiff's claim of direct evidence of discrimination has merit. "When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of discrimination." EEOC v. Alton Packaging Co., 901 F.2d 920, 924 (11th Cir. 1990). Second, where there is

no direct evidence of discrimination, a plaintiff may show discrimination through circumstantial evidence. *See* Wilson, 376 F.3d at 1086. Any evidence that merely suggests discrimination, but does not conclusively establish it, is considered circumstantial evidence. Id. In this case, Plaintiff makes no claims of direct discrimination, and therefore, she must rely on circumstantial evidence to prove her claim.

Without any direct evidence of discrimination, the Court must employ the three-step burden-shifting framework found in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L.Ed. 2d 668 (1973). Under this framework, the plaintiff must first make out a prima facie case of discrimination. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). Then the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the employment action. Id. If the employer is able to articulate a reason for the employment decision, the burden shifts back to the plaintiff to demonstrate that the employer's asserted reason is not the real reason for the employment decision and instead mere pretext. Id. at 1024-25. These steps are examined in greater detail below.

To establish a prima facie case of Title VII discrimination, a plaintiff must show that "(1) that she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated [white] employees more favorably; and (4) she was qualified for the job." McCann

v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008).[2] The first element is conceded by both parties because Plaintiff is African-American, which is a protected class. The fourth element, whether Plaintiff was qualified for the job, is likewise not the subject of debate between the parties.

The second element is debated in part. Defendant claims that Plaintiff was not subjected to adverse employment actions when she was "written up" or "harassed," as she claims in her Complaint. (Doc. 1, p. 3.) Defendant contends that these actions do not constitute adverse employment actions, and therefore, Plaintiff cannot make out a prima facie case for these claims.

"To prove an adverse employment action … an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."

---

[2] Plaintiff articulates a different version of the prima facie case from Jones v. Gerwin, 874 F.2d 1534, 1540 (11th Cir. 1989). In that case, the Court stated that the fourth prong of the prima facie case could be met either by showing a similarly situated person outside the protected class was treated more favorably or by showing that the plaintiff did not violate the work rule. The Eleventh Circuit later discredited this articulation, stating that "[w]e stress that, under the Jones formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better." Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306, 1311 n. 6 (11th Cir. 1998), reh'g denied and opinion superseded in part on other grounds, 151 F.3d 1321 (11th Cir. 1998). Based on Jones v. Bessemer, this Court does not adopt Plaintiff's suggestion that compliance with the work rule satisfies the fourth prong of the prima facie case.

Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted). Therefore, to show that an action was adverse, a plaintiff must demonstrate a "serious and material change" in her employment.

In this case, Plaintiff is unable to make a showing of a "serious and material change" in her employment based on her claims that she "harassed" or "written up for minor infractions." The Court finds that these are not adverse actions. However, Plaintiff and Defendant agree that Plaintiff's suspension and termination both constitute adverse actions for the purpose of the prima facie case under Title VII.

With two adverse actions established – termination and suspension – the Court turns to the third element of the prima facie case – whether the employer treated similarly situated white employees more favorably.

To prove this element, a plaintiff must show that his employer treated similarly-situated employees outside his classification more favorably than himself. Coutu v. Martin Cty. Bd. of Cty. Commissioners, 47 F.3d 1068, 1073 (11th Cir. 1995). To make this comparison, a plaintiff must show an employee who is similarly situated in all relevant aspects. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). A comparator need not have the same job title as the plaintiff, however "material differences" in "ranks and responsibilities" may render comparison impossible. Land v. McKeithen, 423 Fed. Appx. 903, 906 (11th Cir. 2011). Instead of comparing job titles, the Eleventh Circuit has noted that the appropriate inquiry is whether the employer subjected the two employees to

different employment policies. Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999).

In determining whether employees are similarly situated for purposes of establishing a prima facie case, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. To properly evaluate comparator evidence, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

In McCann v. Tillman, 526 F.3d 1370 (11th Cir. 2008), the Eleventh Circuit analyzed a plaintiff's Title VII discrimination claim and applied the "nearly identical" standard for comparators. Id. at 1374. The Court adopted this standard over the objections of the plaintiff, who argued for a "similar" standard for comparators. In adopting the stricter "nearly identical" standard, the Eleventh Circuit recognized the difficulty faced by the plaintiff in meeting the standard, but stated that "we are bound by precedent to adhere to the 'nearly identical standard.'" Id. at 1374 n. 4.

In this case, Plaintiff is unable to show a valid comparator under the "nearly identical" standard. Plaintiff names five women in her deposition who she claims are proper comparators. Plaintiff asserts that these five women, all of

whom are white, were treated more favorably than her. Plaintiff's claims regarding these women are addressed below.

First, Plaintiff names Jane Moore as a comparator. Plaintiff claims that Ms. Moore had issues with her performance at Archbold. (Deposition of Angela Jest (Doc. 26) 195.) The record reflects that Ms. Moore was warned in February 1988 and January 2005 for absenteeism, was given a corrective interview for a charting error in 1992, and was given a verbal counseling in March 1999 regarding "poor attitude" and "rudeness." (DSOF ¶ 143.) Plaintiff also provides additional evidence of Ms. Moore's performance including performance evaluations from 2001-2002 (Doc. 37-21, pp. 14-20); 2002-2003 (Doc. 37-21, pp. 21-27); 2004 (Doc. 37-21, pp. 2-7); and 2005 (Doc. 37-21, pp. 8-12). Plaintiff points to these evaluations and claims that they prove that Ms. Moore had "performance deficiencies and medication errors." (Doc. 37, p. 3.)

After review, the Court finds that these evaluations do show that Ms. Moore had areas that needed improvement, but the Court does not find that her performance record demonstrates that she is "nearly identical" to Plaintiff for purposes of comparator evidence. Ms. Moore's evaluation from 2001-2002 reflects that she was proficient in most areas, receiving a grade of 2 on a scale of 0-4 in most categories. The review shows that she scored a 3 in some areas. The evaluation from 2002-2003 also shows mostly scores of 2. She received a 0 in the area of following policies for infection control and received several 1s in the areas of clinical skills, following directions, monitoring patients, notifying the

14

charge nurse when leaving the work area, and assuming responsibility. In 2004, Ms. Moore again received primarily 2s. She received 1s for not being able to help with extra staffing needs, for not waiting until emergent situations were over before going on her break, for not properly assessing newborns for various symptoms, and for failing to check and restock supplies in the nursery. In 2005, Ms. Moore received mostly 2s on her evaluation, but she also received a low score in the areas of responding to patients when they called for help. She received some negative commentary stating that she "is not always tactful" and the hospital had "received patient complaints and requests that she not be responsible for certain patient care." (Doc. 37-21, p. 10.) Other comments reflect that "[h]ealth problems interfere with Jane's productivity" and she has "been heard to make negative comments about some of her co-workers." Id.

Despite these reviews, the Court is not convinced that Ms. Moore is a proper comparator. Though Ms. Moore's evaluations revealed some areas of concern, her record is not fraught with the same number of infractions that Plaintiff's records reveal. Plaintiff's record reveals numerous issues with absenteeism, tardiness, and failure to clock in and out. Further, Plaintiff was subject to twelve corrective interviews for various performance and patient care issues. Ms. Moore's record does not reflect issues of the same frequency or degree as Plaintiff, and therefore, Ms. Moore is not "nearly identical" and is not a proper comparator.

Next, Plaintiff claims that Ms. Virginia Ponder is a proper comparator. Plaintiff states that Ms. Ponder is comparable based on her level of performance. Plaintiff offers Ms. Ponder's performance evaluations for 2000-2001 and 2005 in support of her allegation. In her review from 2000-2001, Ms. Ponder consistently scored 2s and 3s on her evaluation on a scale of 0-4. (Doc. 37-20, pp. 8-16.) She scored a 1 in the category of working with others and next to her score is the written comment "strive to be more tactful to co-workers." (Doc. 37-20, p. 15.) However, in eighty-two categories, Ms. Ponder scored at the standard or above the standard, save for the one category about getting along with others.

In the 2005 review, Ms. Ponder scored 2s, 3s, and 4s in thirty-six categories. She scored two 1s in using good judgment in dealing with difficult situations with others (Doc. 37-20, p. 3) and maintaining good working relationships with others (Doc. 37-20, p. 4). In these categories, the reviewer wrote that Ms. Ponder "need[s] to work to improve tactfulness when dealing with some staff members" and "can be rude with some staff." Despite these comments, the Court finds that Ms. Ponder is not a proper comparator for purposes of comparing Ms. Ponder's performance with that of Plaintiff. Similar to the comparison between Plaintiff and Ms. Moore, discussed above, comparing Plaintiff to Ms. Ponder does not support a finding that the two women are proper comparators because they are not "nearly identical." Plaintiff's disciplinary record is far more extensive than Ms. Ponder's record, and therefore, the two cannot be

considered proper comparators for the purpose of establishing a prima facie case.

Third, Plaintiff suggests Jessica White as a proper comparator for purposes of establishing a prima facie case for discrimination. Plaintiff alleges that Ms. White was "noted for being rude" in a patient survey. (Jest 200.) However, Plaintiff acknowledges that she has no knowledge about whether Ms. White was written up or asked to be a part of a customer service course based on her alleged infractions. (Jest 201.) The record shows that Ms. White was given verbal warnings in June 2009 and May 2010 for failure to clock in or out, and in December 2010 she was given a warning for clocking in early or clocking out late. (DSMF ¶ 148.) However, there is no evidence of any other performance issues in Ms. White's records. Thus, Plaintiff has failed to put forth enough evidence to demonstrate that Ms. White is a proper comparator. Her only infractions relate to clocking in and out properly. This does not show that Ms. White is "nearly identical" to Plaintiff, and therefore, Ms. White is not a proper comparator.

Fourth, Plaintiff names Becky McKeown as a proper comparator. Plaintiff alleges that Ms. McKeown was "very insubordinate." (Jest 195.) Plaintiff stated that Ms. McKeown was "about the only one that's got a terrible temper besides myself. And I'm not nearly as bad as she is." (Jest 195-96.) The record reflects that Ms. McKeown was given a verbal warning for absenteeism in 2007, and she received a verbal counseling in 2011 for failure to change a hearing screen.

17

However, there is no other evidence of performance deficiencies besides Plaintiff's statement. Based on the record, Plaintiff has presented insufficient evidence to show that Ms. McKeown is a proper comparator.

Finally, Plaintiff names Lori Kohler-Rozar as a comparator. Plaintiff states that Ms. Kohler-Roza had a "hot temper" and was unprofessional. (Jest 196.) The record reflects that Ms. Kohler-Roza worked at Grady General from August 1995 until her resignation in May 2002. In March 2001, Ms. Kohler-Roza received a Final Corrective Interview for "unprofessional behavior." (DSOF ¶ 150.) However, Ms. Kohler-Roza does not have an overall record that is equivalent to that of Plaintiff. Her record does not reflect anywhere near the same amount of disciplinary actions as Plaintiff's record, and therefore, the two women are not "nearly identical" and are not proper comparators.

Zach Wheeler, the Senior Vice President for Human Resources at Archbold Medical Center, Inc. in Thomasville, Georgia since 1992, gave a statement comparing Plaintiff's record to that of other Archbold employees. He stated that during his twenty years at Archbold, he "knew of no other employee whose conduct combined the unprofessional, rude and disrespectful behavior, the poor work performance, the customer service issues, and the ongoing patient concerns as did that of [Plaintiff]." (Declaration of Zach Wheeler, Doc. 22, p. 6-7.) The Court finds the statement from Mr. Wheeler persuasive. Plaintiff has named five other Archbold employees who had some issues with performance, customer service, or unprofessional behavior. However, none of these women have an

overall record that is comparable with Plaintiff. Thus, Plaintiff has not presented sufficient evidence to show that any of the women she named are proper comparators.

For the above stated reasons, the Court finds that Plaintiff has not named a proper comparator and, therefore, she cannot establish the prima facie case for race discrimination under Title VII. Without a prima facie case, Plaintiff's case cannot move forward and it is unnecessary to move forward with the burden-shifting analysis.

### B. Disability Discrimination Claim

The Americans with Disabilities Act ("ADA") prohibits discrimination "against a qualified individual on the basis of disability in regard to … discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case for disability discrimination under ADA, a plaintiff must show that (1) she has a disability, (2) that, with or without reasonable accommodations, she can perform the essential functions of the position she holds; and (3) that she was discriminated against because of her disability. Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998).

In this case, Defendant concedes that Plaintiff has established the first two elements of the prima facie case. However, Defendant disputes the third element. Plaintiff claims that she can prove that she was discriminated against by showing that other non-disabled employees engaged in similar conduct were

19

treated differently. (Doc. 36, p. 11.) However, as discussed above, Plaintiff is unable to present any evidence to show a valid comparator who was in a "nearly identical" situation and was treated differently. Because Plaintiff cannot name a valid comparator, her claim for disability discrimination, like her claim for race discrimination, cannot stand.

IV.   **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 18) is granted. Plaintiff was unable to provide evidence of a proper comparator, and therefore, her race and disability discrimination claims against Defendant fail as a matter of law.

**SO ORDERED**, this 8th day of February, 2013.

*s/ Hugh Lawson*
HUGH LAWSON, SENIOR JUDGE

ebr